IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| LISA LOCKETT, *on behalf of* AMY GUNTER, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 05-3550-CV-S-NKL ) |
| JO ANNE BARNHART, COMMISSIONER OF SOCIAL SECURITY, | ) ) ) |
| Defendant. | ) ) |

ORDER

Pending before the Court is Plaintiff Lisa Lockett's ("Lockett") Motion for Summary Judgment [Doc. # 7]. Lockett seeks judicial review of the Commissioner's denial of her request on behalf of her daughter, Amy Gunter ("Gunter"), for child's supplemental security income under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq*. The complete facts and arguments are presented in the parties' briefs and will be duplicated here only to the extent necessary.[1] Because the Court finds that the Administrative Law Judge's decision is supported by substantial evidence in the record as a whole, the Court affirms the ALJ's decision.

**I.    Background**

---

[1] Upon review of the record and the law, the Court finds the Defendant's position persuasive. Portions of the Defendant's brief are adopted without quotation designated.

1

### A. Medical Records

Lockett sought psychological help for Gunter at the Ozark Medical Center-Behavioral Health Care in early 2001 after Gunter was molested by her uncle. She was first diagnosed with post traumatic stress disorder and sexual abuse by therapist Elizabeth Hykes, ACSW, LCSW, on March 26, 2001. (Tr. 456-60). Hykes saw Gunter for individual and family therapy in April and May 2001 (Tr. 453-55), and again on September 13, 2002 (Tr. 487-88). At the latter meeting, Gunter reported that she liked school and was doing "okay with her course work." (Tr. 487.) She had three best friends at school. (Tr. 487.) Gunter attended a girls group therapy session on four occasions. (Tr. 480, 483-85.) On November 4, 2002, she participated very well in session, interacted well with other group members and was very helpful to a new group member. (Tr. 483.)

Gunter was also treated by Latha Venkatesh, M.D., at Burrell Behavioral Health from January 6, 2003, through March 1, 2004. At their first meeting, Venkatesh noted Gunters' grades were good and that she was doing well in school. (Tr. 511.) Venkatesh's impression was major depression and recommended individual and family therapy and wanted to try Paxil or Zoloft. (Tr. 512.) In February 2003, Dr. Venkatesh noted that Gunter had a happy mood and cheerful affect. (Tr. 545.) On March 19, 2003, Venkatesh noted that Gunter was doing better at school and home but was upset that her father had cancer. (Tr. 544.) On May 23, 2003, Gunter told Venkatesh that she was doing "ok" and was proud that she had gotten As and Bs on her grade card. (Tr. 543.) She was calmer, sleeping "ok" and not hyperactive. (Tr. 543.) In June and July 2003, Gunter reported

2

doing well. (Tr. 541-42.) Gunter and her mother reported that she was doing "fine" and Dr. Venkatesh noted that she was happy on August 1, 2003. (Tr. 540.) Gunter reported restlessness and trouble with night terrors on September 22, 2003. (Tr. 538.) In October 2003, Lockett reported that Gunter was doing "ok," had no major problems, and slept well. (Tr. 537.) Gunter was doing "very well" at home and school on November 11, 2003. (Tr. 536.) She was concentrating well and getting good grades. (Tr. 536.) On December 9, 2003, Gunter was doing "very well at school." (Tr. 535.) She slept well, denied medication side effects and had no behavior problems. (Tr. 535.) On January 6, 2004, Lockett reported Gunter was getting "As" at school. (Tr. 534.) Her mood was "OK" and her affect was euthymic. (Tr. 534.) On February 11, 2004, Lockett told Dr. Venkatesh that Gunter had been doing well at school, slept well and had no behavior problems. (Tr. 532.) She was pleasant and her mood and affect were euthymic. (Tr. 532.) On March 1, 2004, Dr. Venkatesh indicated that Gunter had no complaints at school. (Tr. 531.) She slept well, was pleasant and calm, and had no agitation or anxiety. (Tr. 531.) On March 29, 2004, Dr. Venkatesh completed an Individual Functional Assessment, opining that Gunter was markedly limited in acquiring and using information, attending and completing tasks and health and physical well being. (Tr. at 526-529.) Dr. Venkatesh's assessment does not include any explanatory notes for her conclusions.

On May 26, 2004, Gunter was seen by Andreea Arvinte, M.D., at the Ozark Medical Center-Behavioral Health Care. Arvinte's treatment notes indicate that Gunter

continued to do well. (Tr. 553.) If she took her medication, she did "really well" (Tr. 553). She was happy and bright. (Tr. 553.) On June 24, 2004, she was less distractible, less forgetful and less intrusive. (Tr. 552)

**B.      Hearing**

A hearing was held in front of Administrative Law Judge Linda D. Carter on October 19, 2004. Lockett testified that Gunter was eleven years old at the time and attended special education classes. She stated that Gunter was not adapting well to 5th grade and may need to attend special education classes in all areas except music and physical education. Lockett testified that, mentally, Gunter acts like a seven or eight year old. She stated that physically, Gunter is small for her age. (Tr. at 49, 51.) Gunter has difficulty reading, especially with understanding and spelling. Lockett testified that Gunter was held back in Kindergarten. She stated that Gunter has trouble understanding and following direction. She often has to have things explained to her three to four times. She stated that Gunter takes a long time to finish a task and gets frustrated and starts bawling. (Tr. at 50-51.)

Lockett testified that Gunter did not have any friends her age. She stated that Gunter does not know the difference between right and wrong. She has problems making decisions. Lockett testified that Gunter cries most of the time, wants to sleep all the time and is a bundle of nerves. (Tr. at 53.) Lockett testified that Gunter sleeps for fourteen hours a night. Gunter is scared of the dark. Lockett testified that Gunter wets the bed and has to wear pull ups. (Tr. at 54.) Lockett stated that she has to make sure Gunter washes

4

her hair and brushes her teeth and hair.  She stated that Gunter is unable to match her own clothes.  (Tr. at 55.)

Gunter's step-father, John Lockett, testified that Gunter gets violent at times.  She gets so angry at times that she does not even think.  He further stated that she would act on impulse.  (Tr. at 58.)

The ALJ also took testimony from the government's state medical expert, Clayton Pettipiece, who testified that Gunter did not meet or equal any listed impairment.  Pettipiece found Gunter to be less than marked in the acquiring-and-using-information and the interacting-and-relating-to-others categories and found her to have no limitations in attending to and completing tasks, moving about and manipulating objects and health and physical well being.  (Tr. at 45-47.)

## II.     Discussion

On August 22, 1996, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (the "1996 Act"), which amended the statutory standard for children seeking SSI benefits based on disability.  *See* § 211(a) of Pub. L. 104-193, 110 Stat. 2105, 2188-2189 (codified at 42 U.S.C. § 1382c(a)(3)(C)).  Prior to enactment of Pub. L. 104-193, a child would be considered disabled if he or she had a medically determinable physical or mental impairment that met the statutory duration requirement and that was "of comparable severity" to an impairment that would disable an adult.  42 U.S.C. § 1382c(a)(3)(A) (1994); 20 C.F.R. § 416.924 (1996).  The 1996 Act

5

revised this standard to one under which a child seeking SSI benefits based on disability will be found disabled if he or she has a medically determinable impairment "which results in marked and severe functional limitations," and which meets the statutory duration requirement. 42 U.S.C. § 1382c(a)(3)(C) (1994 and Supp. II 1996).

On September 11, 2000, SSA published final rules, which became effective on January 2, 2001. *See* 65 Fed. Reg. 54,747.3. The final rules define the statutory standard of "marked and severe functional limitations" in terms of listing-level of severity; *i.e.*, an impairment that meets, medically equals, or functionally equals the severity of an impairment in the listings. *See* 20 C.F.R. § 416.926a(a) (2005). The final rules follow a three-step sequential evaluation, under which SSA will consider (1) whether the child is working; (2) whether the child has a medically determinable "severe" impairment or combination of impairments; and (3) whether the child's impairment or combination of impairments meets, medically equals, or functionally equals the severity of an impairment in the listings. *See* 20 C.F.R. § 416.924 (2005).

In accordance with the final regulations, a child's functional limitations will be evaluated in the following six domains:

      1) Acquiring and using information;
      2) Attending and completing tasks;
      3) Interacting and relating with others;
      4) Moving about and manipulating objects;
      5) Caring for yourself; and
      6) Health and physical well-being.

20 C.F.R. § 416.926a (b) (I-vi) (2005). A medically determinable impairment or combination of impairments functionally equals a listed impairment if it results in

6

"marked" limitations in two domains of functioning or an "extreme" limitation in one domain. *See* 20 C.F.R. § 416.926a (2005).

### A. The ALJ Properly Discredited and Gave Less Than Controlling Weight to the Opinion of Dr. Venkatesh

Gunter argues that the ALJ erred in giving less than controlling weight to the opinion of Dr. Venkatesh, her treating doctor. *See* Pl.'s Br. at 10-17. "Although a treating physician's opinion is generally entitled to substantial weight, such opinion does not automatically control, since the record must be evaluated as a whole." *Wilson v. Apfel*, 172 F.3d 539, 542 (8th Cir. 1999) (citing *Cruze v. Chater*, 85 F.3d 1320, 1324-25 (8th Cir. 1996)). The Commissioner may reject the opinion of any medical expert "if it is inconsistent with the medical record as a whole." *Bentley v. Shalala*, 52 F.3d 784, 787 (8th Cir. 1995).

The ALJ considered Dr. Venkatesh's assessment of marked limitations in acquiring and using information, attending and completing tasks, interacting and relating to others, caring for yourself, and health and physical well-being. (Tr. 19, 506-07, 527-28). The ALJ found that Dr. Venkatesh's assessment did not accurately reflect the evidence in the record and, therefore, was not given controlling weight. (Tr. 19.)

The ALJ found that Dr. Venkatesh's treatment notes are not consistent with her opinion expressed in the Medical Source Statement. (Tr. 19.) A review of Dr. Venkatesh's treatment notes supports the ALJ's finding. Dr. Venkatesh noted that Gunter had a happy mood and cheerful affect in February 2003. (Tr. 545.) On March 19, 2003, Dr. Venkatesh noted that Gunter was doing better at school and home but was upset that

7

her father had cancer. (Tr. 544.) On May 23, 2003, Gunter told Dr. Venkatesh that she was doing "ok" and was proud that she had gotten As and Bs on her grade card. (Tr. 543.) She was calmer, sleeping "ok" and not hyperactive. (Tr. 543.) In June and July 2003, Gunter was doing well. (Tr. 541-42.) Gunter and her mother reported that she was doing "fine" and Dr. Venkatesh noted that she was happy on August 1, 2003. (Tr. 540.) Gunter reported restlessness and trouble with night terrors on September 22, 2003. (Tr. 538.) In October 2003, Lockett reported that Gunter was doing "ok," had no major problems, and slept well. (Tr. 537.) Gunter was doing "very well" at home and school on November 11, 2003. (Tr. 536.) She was concentrating well and getting good grades. (Tr. 536.) On December 9, 2003, Gunter was doing "very well at school." (Tr. 535.) She slept well, denied medication side effects and had no behavior problems. (Tr. 535.) On January 6, 2004, Gunter's mother reported she was getting "As" at school. (Tr. 534.) Her mood was "OK" and her affect was euthymic. (Tr. 534.) On February 11, 2004, Lockett told Dr. Venkatesh that Plaintiff had been doing well at school, slept well and had no behavior problems. (Tr. 532.) She was pleasant and her mood and affect were euthymic. (Tr. 532.) On March 1, 2004, Dr. Venkatesh indicated that Gunter had no complaints at school. (Tr. 531.) She slept well, was pleasant and calm, and had not agitation or anxiety. (Tr. 531.) Dr. Venkatesh's treatment notes do not reveal marked limitations.

Additionally, Dr. Venkatesh's treatment notes discussed above and treatment notes from Dr. Arvinte show that Gunter did well on medication. (Tr. 20, 530-46, 553.) When

8

a claimant's complaints can be addressed with medication, it cannot be considered disabling. *See Patrick v. Barnhart*, 323 F.3d 592, 596 (8th Cir. 2003) (citing *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.")). On May 26, 2004, Dr. Arvinte noted that Gunter did "really well" on medication. (Tr. 553.)

The ALJ's decision to discount Dr. Venkatesh's Medical Source Statement is also supported by the opinion of the medical expert, Clayton Pettipiece, M.D., who testified that Dr. Venkatesh's treatment notes were inconsistent with her Medical Source Statement. (Tr. 45-47) Dr. Pettipiece also testified that Gunter did not meet or equal any listed impairment and that, in his opinion, she had less that marked limitations in those areas evaluated by Dr. Venkatesh. Lockett argues that even if Dr. Venkatesh's assessment was inconsistent with Dr. Pettipiece's, she is not the only doctor to find that Gunter had marked limitations. Lockett points to a 2001 assessment by another state consultant, Lester O. Brand, PsyD., who found Gunter markedly limited in interacting and relating with others.[2] Lockett argues that Dr. Venkatesh's assessment is consistent with Dr. Bland's assessment, and that it is really Dr. Pettipiece's assessment that is the outlier. But Dr. Bland found Gunter to be markedly limited in only one area, a finding insufficient to award benefits. Dr. Venkatesh found Gunter markedly limited in three areas. Thus, it is Dr. Venkatesh's assessment that is inconsistent with both Dr. Pettipiece

---

[2]Since Dr. Bland's evaluation dates to 2001, two years before Plaintiff filed the current application for benefits, his assessment appears to have been given pursuant to a prior application for disability benefits. That assessment is raised only in Plaintiff's brief and does not seem to have been considered by the ALJ in this case.

9

and Dr. Bland's. Moreover, Dr. Venkatesh's assessment includes no notes explaining her findings. The only evidence in the record to explain Dr. Venkatesh's Medical Source Statement is her own treatment notes which, as testified to by Dr. Pettipiece, are inconsistent with her conclusions.

There is substantial evidence in the record to support the ALJ's decision to discredit Dr. Vankatesh's assessment.

### B. Substantial Evidence Supports the ALJ's Assessment of the Functional Domains

Gunter argues that she has marked functional limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, health and physical well-being, and self-care. *See* Pl.'s Br. at 17-21. A marked limitation is described as "when your impairment interferes seriously with your ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2).

With respect to the domain of acquiring and using information, the ALJ found that Gunter had a less than marked limitation. (Tr. 22.) School records revealed that Gunter could learn when she was provided a stable environment and attended school regularly. (Tr. 22, 152-54.) On May 7, 2001, the Special Education director wrote a letter stating that Gunter was not failing any subjects, was receiving Bs and Cs, and she could do her work. (Tr. 308.) She attended speech classes, but, according to the speech pathologist, there were no concerns or changes in that area. (Tr. 308.) In 2003, Gunter was in a regular classroom, did well in school and had no behavior problems. (Tr. 368.) Her teacher reported that she "shines" in special education classes. (Tr. 172.) The evidence

10

of record does not support a finding that her impairments seriously interfere with her ability to acquire and use information.

The ALJ also found that Gunter had no limitations in attending and completing tasks. (Tr. 22.) As the ALJ found, although Gunter has been diagnosed with attention deficit hyperactivity disorder, she did well on medication. (Tr. 22.) As discussed above, treatment notes show that Gunter had been doing better in school and was sometimes getting As and Bs. (Tr. 22, 368.) The counselor stated she had not observed problems in this area. (Tr. 152.) Gunter's teacher noted that she frequently needed directions repeated and needs longer to complete tasks, but she was persistent. (Tr. 173.) On November 11, 2003, Gunter was concentrating well and getting good grades. (Tr. 536.) The above evidence does not support a finding of marked limitations in the domain of attending and completing tasks.

In the domain of interacting and relating with others, the ALJ found that Gunter had a less than marked limitation. (Tr. 22.) Although Lockett reported that Gunter was violent toward her sister, school records and treatment records show that she had no behavior problems. (Tr. 22, 153, 174, 532, 535.) Her school counselor stated that she had not observed problems with Gunter relating to adults, and she had no difficulties relating with peers. (Tr. 152.) On March 18, 2002, Gunter had a speech evaluation. (Tr. 374-75, 402-03.) She demonstrated typical syntax for an individual of that geographic area. (Tr. 375, 403.) No gross language deficits were assessed, semantic language skills were within normal limits, and typical receptive and expressive language skills were

11

demonstrated.  (Tr. 375, 403.)  Gunter's articulation skills were not typical of a child of her chronological age.  (Tr. 375, 403.)  She attended 60 minutes per week of speech therapy at school.  (Tr. 414.)  As stated above, Gunter's speech pathologist stated there were no concerns or changes in speech therapy.  (Tr. 308.)  In September 2002, Gunter told Ms. Hykes that she had three best friends at school.  (Tr. 487.)  Gunter does not have marked limitations in the domain of interacting and relating with others.

With respect to self-care, the ALJ found that Gunter had less than marked limitations.  (Tr. 23.)  Although Lockett alleged that Gunter must wear "pull-ups" and required reminders to bathe, school and treatment records reveal that she was well or neatly groomed and appropriately dressed.  (Tr. 23, 176, 478, 480, 481, 483, 486, 511, 555-56, 559.)  Gunter's teacher indicated that she had no problems in this area.  (Tr. 176.)  During a psychosocial/clinical assessment, Gunter and her mother reported that she did chores at home including cleaning her room, emptying trash, doing dishes, and cleaning the bathroom.  (Tr. 362.)  She also helped with grocery shopping, meal preparation and setting the table.  (Tr. 362.)  She took care of her bedtime routine including bathing and brushing her teeth.  (Tr. 362.)

Gunter also alleged a marked limitation in health and physical well-being.  *See* Pl.'s Br. at 20.  It is unclear what evidence suggests marked limitations in this domain. *See* Pl.'s Br. at 20-21.  The evidence as a whole supports the ALJ's finding that she had less than marked limitations in health and physical well-being.  (Tr. 24.)  Although at one point, Gunter was frequently absent from school, allegedly due to illness, school

personnel doubted Lockett's reports of serious illnesses. (Tr. 24, 152-55, 308, 322, 370.) Gunter's teacher did not describe any chronic or episodic conditions that were a concern. (Tr. 177.) The medical record also does not show treatment for the illnesses alleged such as strep throat, chicken pox and pneumonia. (Tr. 155, 442-51.)

In summary, as the ALJ found, Gunter did not functionally equal a listed impairment. Substantial evidence supports the ALJ's finding that Gunter is not disabled.

### C. The ALJ Properly Considered the Severity of Gunter's Limitations

Gunter argues that the ALJ did not properly consider her anxiety, affective disorder, speech and language delays, or developmental disorder. Although the ALJ did not specifically state that these impairments were severe impairments, she considered the combination of her impairments in determining that Gunter did not functionally equal any listing. (Tr. 24.) The ALJ discussed Gunter's premature birth and reading and articulation difficulties. (Tr. 19.) Moreover, Gunter was not diagnosed with anxiety or affective disorder in the medical records. (Tr. 459, 478-88, 512, 517, 520, 524, 531-46.) An ALJ has sufficiently considered impairments in combination when she has separately discussed each impairment, and made a finding that a Claimant's impairments are not disabling. *See Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir. 1992).

## III. Conclusion

For the foregoing reasons, the Court concludes that the ALJ's determination was supported by substantial evidence in the record as a whole. Accordingly it is hereby

ORDERED that Lockett's Motion for Summary Judgment [Doc. # 7] is DENIED.

The Decision of the ALJ is AFFIRMED.


                                             s/ Nanette K. Laughrey
                                             NANETTE K. LAUGHREY
                                             United States District Judge

Dated:  June 22, 2006
Jefferson City, Missouri